# United States Tax Court

T.C. Memo. 2024-22

WHISTLEBLOWER 14376-16W,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent[1]

_____

Docket No. 14376-16W.                    Filed February 14, 2024.

_____

*Sealed*,[2] for petitioner.

*Ashley M. Bender*, *Moenika N. Coleman*, and *Brooke N. Stan*, for respondent.

## SUPPLEMENTAL MEMORANDUM OPINION

THORNTON, *Judge*: This Court previously remanded this case to the Internal Revenue Service (IRS) Whistleblower Office (WBO) for further consideration of petitioner's claim for an award pursuant to section 7623(b).[3] The WBO subsequently issued a supplemental determination affirming its previous denial of petitioner's claim. Pending before us are (1) petitioner's Motion to Compel Production of

_____

[1] This Opinion supplements our previously filed opinion *Whistleblower 14376-16W v. Commissioner*, T.C. Memo. 2017-181 (T.C. Memo. 2017-181).

[2] The name of petitioner's counsel has been omitted in furtherance of protecting petitioner's identity.

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*2]** Documents and (2) the parties' Cross-Motions for Summary Judgment.

## *Background*

We recount below pertinent aspects of the factual background discussed in our prior opinion, T.C. Memo. 2017-181, and include some additional relevant details.

### *Petitioner's Form 211*

On or about November 22, 2010, petitioner submitted to the WBO a Form 211, Application for Award for Original Information, asserting that taxpayer 1 and other individuals and entities had received unreported income as reflected in a memorandum attached to the Form 211.[4] The attached memorandum lists 20 business entities in which taxpayer 1 allegedly held interests and also lists five individuals who "may also have knowledge of [taxpayer 1's] financial activities and/or unpaid tax liabilities resulting from their association with [taxpayer 1]." In response to the directive in line 16 of Form 211 to "[d]escribe the amount owed by the taxpayer(s)," there is a cross-reference to a chart appearing in the attached memorandum. That chart sets forth, with respect to taxpayer 1 and four of the related entities (taxpayer 1's controlled corporations, taxpayers 2 and 3, plus two other flowthrough entities), for the years 2007 through 2010, various amounts of income, aggregating hundreds of millions of dollars, that "it is believed . . . [have] never been subject to tax."[5] The Form 211 and attached memorandum do not otherwise expressly assign unreported income to any other

---

[4] We refer to the target taxpayers in generic terms to protect petitioner's identity and the identities of nonparty taxpayers. *See* Rule 345(b).

[5] More particularly, this chart attributes to taxpayer 1 and a flowthrough entity, for tax year 2009, over $437 million of combined untaxed income from agreements with two energy holding companies. The chart also alleges that for tax years 2007, 2009, and 2010 taxpayer 1 had, all together, over $285,000 of unreported income associated with a specified bank account and for tax year 2007 over $7 million of unreported income attributable to an "Unaudited Financial Statement." The chart attributes to a different flowthrough entity $300,000 of unreported income from a different specified bank account for 2007. The chart assigns to taxpayer 2 over $1.8 million of total unreported income for tax year 2007 attributable to a specified bank account and a letter of intent with an energy company. The chart assigns to taxpayer 3 $150 million of unreported income for tax year 2009 attributable to a lease and smaller amounts for years 2009 and 2010 attributable to a specified bank account.

[*3] business entities or individuals.  The WBO assigned No. 2011-001890 to petitioner's claim.

*Target Taxpayers' Voluntary Disclosure Program Request*

Before the WBO had taken any action on petitioner's whistleblower claim, on January 27, 2011, the IRS Criminal Investigation Division (CI) received a letter from a law firm requesting that taxpayers 1, 2, and 3 (target taxpayers) enter the IRS Voluntary Disclosure Program (VDP).[6]  The VDP request did not include any tax returns, estimates of income, or other documents.

On May 12, 2011, CI received another letter from the same law firm relating to the VDP request.  As with the letter submitted on January 27, 2011, no tax returns, estimates of income, or other documents were included with the May 12, 2011, letter.  On or about May 20, 2011, CI Special Agent Denise Corcoran, in CI's Dallas, Texas, field office, referred the VDP request to the IRS Small Business/Self-Employed Examination Division (SB/SE).

*WBO Referral to CI*

In the meantime, on or about March 29, 2011, the WBO had forwarded petitioner's Form 211, excluding the supporting documents, to CI Analyst Jack Grauch (Analyst Grauch), in CI's Philadelphia Lead Development Center, to perform an initial review with respect to taxpayer 1.  On June 1, 2011, having received no response from CI, the WBO sent a followup email to Analyst Grauch and CI Agent Robert Cohen (Agent Cohen).  That same day Analyst Grauch forwarded the email to CI Investigative Analyst George Jordan (Analyst Jordan) in CI's Philadelphia Lead Development Center.  On June 2, 2011, Analyst

---

[6] The VDP is "a long-standing practice of IRS Criminal Investigation (CI) providing taxpayers with criminal exposure for tax and tax-related crimes a means to come into compliance with the law and potentially avoid criminal prosecution." *Internal Revenue Manual* (IRM) 4.63.3.1.1.3 (Apr. 27, 2021).  The 2011 IRS Offshore Voluntary Disclosure Initiative (OVDI), which was one of several iterations of various IRS offshore voluntary disclosure programs that terminated in 2018, was a "counterpart" of this voluntary disclosure practice directed specifically at U.S. taxpayers with undisclosed income from offshore assets. *Shands v. Commissioner*, No. 13499-16W, 160 T.C., slip op. at 3 (Mar. 8, 2023); *see* IRM 4.63.3.1 (Apr. 27, 2021). The administrative record sometimes refers to the target taxpayers' request as a VDP request and sometimes as an OVDI request.  The parties agree that the OVDI program had not yet been initiated when the target taxpayers first made their request and that in fact they participated in the VDP program.

[*4] Jordan responded to the WBO that he intended to forward petitioner's claim to the field and requested that all supporting information be forwarded to CI. Shortly thereafter, the WBO forwarded petitioner's complete Form 211, including the supporting documents, to Analyst Jordan.

On February 3, 2012, Agent Cohen sent to the WBO a completed Form 11369, Confidential Evaluation Report on Claim for Award, with respect to taxpayer 1.[7] This Form 11369 indicated that CI had not examined the case because it previously had been referred to SB/SE for examination. The attached narrative states:

> Prior to CI receiving this referral from the WBO, [taxpayer 1] requested to participate in the IRS Voluntary Disclosure Program. [Taxpayer 1] was cleared by CI to enter the program; at which point [taxpayer 1's] request was referred to SB/SE Examination.
>
> CI received the Voluntary Disclosure request on January 27, 2011. Worked by S/A [Special Agent] Denise Corcoran, Dallas FO [field office]. CI closed the Voluntary Disclosure as a Direct referral to SB/SE on May 20, 2011. On July 26, 2011, CI received the referral from the WBO. Taxpayer [1] was already accepted into program and referred to SB/SE.

*WBO Referral to SB/SE*

On February 10, 2012, after receiving CI's Form 11369, the WBO referred petitioner's whistleblower claim to SB/SE for further investigation, again identifying taxpayer 1 as the subject of the claim. The WBO analyst's transmittal memorandum explained that petitioner's Form 211 information had previously been shared with CI, which had declined to pursue the matter; the memorandum noted that taxpayer 1 had "filed Domestic Voluntary Disclosure in 2011."

*SB/SE's Examination and Recommendations*

On July 11, 2012, petitioner's Form 211 was assigned to an SB/SE Field Examination Group in Dallas, Texas, managed by Supervisory Revenue Agent Brenda Perritt (Group Manager Perritt). The examination was assigned to Revenue Agent Chris Martin (RA Martin), who began working the case on July 30, 2012. After reviewing the case

---

[7] CI did not complete Forms 11369 for taxpayers 2 and 3.

**[\*5]** file, RA Martin preliminarily concluded that the VDP request submitted on behalf of the target taxpayers was invalid because the IRS had already received the whistleblower's information before the VDP request was submitted.[8]  At some point in this process Group Manager Perritt disclosed to the target taxpayers' representative the existence, but not the identity, of a whistleblower.  On August 28, 2012, RA Martin emailed WBO Analyst Chu S. Pak, stating: "[I]t is my understanding that none of the whistleblower information can be shared with the REP or the TP, is that correct?  The REP wants a copy of all the whistleblower info to prepare returns."  WBO Analyst Pak responded: "Per IRM 25.2.2, the informant identity and information are strictly confidential.  Do not disclose them to TP and REP.  You can't tell them that we have an informant."

An entry dated September 11, 2012, in RA Martin's Examining Officer's Activity Record indicates that he had spoken to Group Manager Perritt, who had spoken to WBO and CI personnel, and states, without elaboration: "We are going to honor the voluntary disclosure."  A later entry indicates that in a September 18, 2012, phone call with the target taxpayers' representative, Group Manager Perritt stated that "we would follow the spirit of the law and honor the voluntary disclosure."

Accordingly, RA Martin conducted his examination of the target taxpayers as a voluntary disclosure.  On January 28, 2013, RA Martin phoned the target taxpayers' representative to request the taxpayers' signed returns.  RA Martin used petitioner's information to write an Information Document Request (IDR), which he issued to the target taxpayers on March 15, 2013.

On March 28, 2013, the IRS received and processed the target taxpayers' delinquent returns for tax years 2007, 2008, and 2009 (as well as for 2006 for taxpayer 2).[9]  These delinquent returns were

---

[8] IRM 9.5.11.9(3) (Dec. 2, 2009) states that a voluntary disclosure must be timely.  A voluntary disclosure is timely if received before the IRS "has received information from a third party (e.g., informant, other governmental agency, or media) alerting the IRS to the specific taxpayer's noncompliance."  IRM 9.5.11.9(4)(b) (Dec. 2, 2009).

[9] Taxpayer 1's Forms 1040, U.S. Individual Income Tax Return, reported these income tax liabilities: $65,111 for 2007, $35 for 2008, and $74,118 for 2009.  Taxpayer 2's Forms 1120, U.S. Corporation Income Tax Return, reported these income tax liabilities: zero for 2006, $140,971 for 2007, $44,685 for 2008, and zero for 2009.  Taxpayer 3's Forms 1120 reported these income tax liabilities: zero for 2007, zero for 2008, and $832,075 for 2009.  The tax liabilities reported by taxpayer 1 were attributable predominantly to ordinary dividends; the tax liabilities reported by

[*6] accompanied by checks in payment of the reported tax liabilities. On February 28, 2014, respondent's Field Examination unit received taxpayer 1's Forms 1040X, Amended U.S. Individual Income Tax Return, for tax years 2007, 2008, 2009, and 2010, reporting relatively small or nominal amounts of increased tax due for these years.[10]

On May 19, 2014, RA Martin issued another IDR. On September 30, 2014, respondent received from the target taxpayer's representative a Form 1120X, Amended U.S. Corporation Income Tax Return, for taxpayer 3's tax year 2009, as well as a second Form 1040X for taxpayer 1's 2009 tax year, which reported, on the basis of information in taxpayer 3's Form 1040X, additional tax resulting from additional dividends received from taxpayer 3.[11]

On October 1, 2014—one day after receiving taxpayer 1's second Form 1040X and taxpayer 3's Form 1120X—RA Martin prepared Form 4549, Income Tax Examination Changes, with respect to taxpayer 1's tax years 2007–10. This Form 4549 indicated that RA Martin had accepted taxpayer 1's Forms 1040 and 1040X as filed. The Forms 4549 indicate that for tax years 2007, 2008, and 2009 taxpayer 1 owed, in total, taxes, penalties, and interest of $47,594.69, with no amount owed for 2010.[12]

Also on October 1, 2014, RA Martin prepared for taxpayers 2 and 3 Forms 4549–A, Income Tax Examination Changes, showing no changes to the taxable income and income tax reported on taxpayer 2's

taxpayers 2 and 3 were attributable predominantly to gains from sales of business assets.

[10] The increased amounts of tax due reported on these returns were: $13,850 for 2007 (attributable primarily to income reported on Schedule C, Profit or Loss From Business), $542 for 2008 (attributable primarily to dividends), $1,598 for 2009 (attributable primarily to Schedule C income), and $119 for 2010 (attributable to $795 of newly reported Schedule C income). Although the record is unclear on this point, it appears that taxpayer 1's Form 1040X for tax year 2010 amended a Form 1040 that was filed sometime before March 28, 2013, when taxpayer 1 filed delinquent Forms 1040 for tax years 2007–09.

[11] Taxpayer 3's 2009 Form 1120X reflected the payment of a cash dividend but reported no additional tax due. Taxpayer 1's second 2009 Form 1040X reported a $112,068 increase in dividends received, "BASED ON A RECENTLY FILED FORM 1120X" from taxpayer 3, resulting in additional tax due of $16,811.

[12] The only adjustments to income shown on the Form 4549 were for the same adjustments reported on taxpayer 1's Forms 1040X, plus accuracy-related penalties under section 6662 and interest under section 6601.

**[\*7]** Forms 1120 for 2006–09 or on taxpayer 3's Forms 1120 and 1120X for 2007–09.

On October 20, 2014, RA Martin received a cashier's check from the target taxpayers for the additional amounts owed as reflected on taxpayer 1's Forms 1040X and on Form 4549.

Upon completing his examinations regarding the target taxpayers, RA Martin forwarded to the WBO three largely identical Forms 11369 dated October 1, 2014 (one each for taxpayers 1, 2, and 3), enclosing narratives and documents from SB/SE's examinations.[13]  On these Forms 11369 RA Martin checked the "Yes" box next to these questions in section 11 ("Did the whistleblower contribute to the development of facts in the audit or investigation?"):

A.  Did the Service use the information the whistleblower provided to develop specific document requests or other inquiries to the taxpayer?

B.  Did the Service use the information provided by the whistleblower to validate the completeness and accuracy of the taxpayer's response to information requests?

RA Martin checked the "No" box next to all other questions (C. through J.) in section 11, thereby indicating that petitioner had not otherwise contributed to the development of facts in the audit or investigation. The three Forms 11369 include identical attachments, each stating in full:

---

[13] For taxpayer 1, the Form 11369 package included: Form 4549 covering tax years 2007–10 with accompanying schedules; Form 886–A, Explanation of Items, for tax years 2007 and 2009; taxpayer 1's Forms 1040 for tax years 2007–09 (without schedules), and Forms 1040X for tax years 2007–10; Form 9984, Examining Officer's [Martin's] Activity Record, with entries from July 30, 2012, to November 17, 2014, including workpapers stating that for each of the tax years 2007–10, "Adjustments made on basis of Forms 1040X."  For taxpayer 2 the Form 11369 package included Form 4549–A for tax years 2006–09, indicating "NO CHANGE"; Forms 1120 for tax years 2006–09 (without schedules); and Workpaper 400, Minimum Income Probe Corporations and Other Business Returns, indicating that taxpayer 2's delinquent returns were "accepted as filed."  For taxpayer 3 the Form 11369 package included Form 4549–A for tax years 2007–09, indicating "NO CHANGE"; Forms 1120 for tax years 2007–09 (without schedules); Form 1120X for tax year 2009; and Workpaper 400, indicating that taxpayer 3's delinquent returns were "accepted as filed."

**[*8]** 12/1/2010    Form 211 Filed

1/11/2013    [Taxpayer 2] received a letter from the IRS because no 2008 [Form] 1120 was received [As stated in T.C. Memo. 2017-181, at *5 n.4, we conclude that this date should actually be January 11, 2011.]

1/27/2011    [Representative] sent in a voluntary disclosure letter for [taxpayer 1]
The letter covered [taxpayer 1, taxpayer 2, and taxpayer 3]

5/12/2011    Letter received from [representative] for Voluntary Disclosure.
Q 10 - [Taxpayer 1] is an oil and gas entrepreneur
Q 11 - TP desires to be tax compliant
Q 18 - TP will fine [sic] personal tax returns and, as appropriate, returns of certain affiliated entities in which [taxpayer 1] holds an interest. These are largely flowthrough entities.
Non-filer for '03-'09.

With the filings from [representative], there were no returns prepared, no estimates of income provided, no documents were provided.

2/l0/2012    Memo from whistleblower office - CI was contacted and declined the case.

7/30/2012    RA began working the case

8/28/2012    RA called REP and informed him that [taxpayer 1] was not eligible for voluntary disclosure.

9/11/2012    CI called Brenda Perritt, MGR, and discussed the case with her.

9/18/2012    MGR called REP with RA present and told REP that we would follow the spirit of the law and honor the voluntary disclosure.

[*9]    As the timeline indicates, the TP [taxpayer] filed a voluntary disclosure due to receiving a letter about one of [taxpayer 1's] companies. This was done before the file came to the field. The prior manager told the REP [representative] that we would honor the voluntary disclosure even though there was a whistleblower involved. As a result, the case was worked as a voluntary disclosure case, but summonses were issued to verify that none of the items in the documents provided by the whistleblower were omitted, if they were valid items.

As a result, the delinquent and amended returns received were accepted as filed as no omitted income was identified. The information provided by the whistleblower did not affect any adjustments or delinquent returns.

*WBO's Initial Denial Determination*

On November 21, 2014, the WBO received the Forms 11369 and other documents from RA Martin. On April 10, 2015, WBO Senior Tax Analyst Kenneth Chatham (STA Chatham) was assigned to work petitioner's award claim. On February 24, 2016, STA Chatham mailed a preliminary denial letter to petitioner, copying petitioner's counsel. It stated in part:

The claim has been recommended for denial because the IRS identified the issues prior to receipt of your information and your information did not substantially contribute to the actions taken by the IRS. Prior to receipt of your Form 211 information, the IRS received substantial information on the same issues from another source. Field examinations determined all examination adjustments and assessments from the information provided by this other source. Your information was made available but was not used to start any examinations nor to make any substantial contributions to the development of any of the issues or adjustments pursued.

Also on February 24, 2016, STA Chatham mailed to petitioner's counsel a copy of an Award Recommendation Memorandum (ARM), from STA Chatham to the WBO Director, explaining in more detail the reasons for the recommended denial of petitioner's claim. It stated in part:

[*10] Based on Form 11369 information from both CI and SBSE Exam, this claim should be denied. CI did not take any formal investigative actions in response to the Whistleblower's claim. SB/SE did conduct an examination of the primary taxpayer [taxpayer 1] and [taxpayer 1's] controlled corporations but all tax assessments made and paid resulted directly from the primary taxpayer's OVDI information and from [taxpayer 1's] delinquent and amended tax returns. No significant audit actions or results can be connected to the Whistleblower's Form 211 information.

This claim was initially referred to CI on 3/28/2011. Per Form 11369 dated 2/03/2012 from CI, it declined any formal investigation of the taxpayers because, before the claim was received, the primary taxpayer had already been accepted into the IRS OVDI program. CI received the taxpayer's OVDI request on 1/27/2011 and it was referred by CI to SB/SE on 5/20/2011. The CI Special Agent did not receive the Whistleblower's information until later on 7/26/2011, after the primary taxpayer had already been accepted by CI into the OVDI program and been referred to SB/SE. Per transmittal memo dated 5/17/2011, CI forwarded the primary taxpayer's OVDI package to SB/SE and recommended acceptance of the taxpayer into the OVDI program.

Next, the claim was referred to SB/SE Exam, Gulf States Area, from the Whistleblower Office on 2/10/2012. The claim case was assigned to a Dallas, TX exam group on 7/11/2012. Assigned Revenue Agent Chris Martin started work on the taxpayer cases on 7/30/2012. He conducted audits of the primary taxpayer (individual) and two related C corporations for the 2007–2009 years. Both audits of the corporate entities closed as No Changes (DC 02). As the primary taxpayer was a nonfiler for 2007–2009, delinquent Form 1040 and Form 1040X amended returns were secured from [taxpayer 1] as part of the OVDI program and assessed for these years. All audit deficiencies of the primary taxpayer reported on the audit RARs were determined directly from [taxpayer 1's] own delinquent 1040 and 1040X amended tax returns. These audit

**[*11]** assessments were also promptly paid in full by the primary taxpayer per IDRS transcripts.

The Form 11369's for all taxpayers from the SB/SE examiner were dated 10/01/2014. In it he credited the taxpayer's OVDl application and his delinquent and amended returns for all audit results. He gave no credit to the Whistleblower. In the Form 11369 narrative the examiner stated, ". . . the delinquent and amended returns received were accepted as filed as no omitted income was identified. The information provided by the Whistleblower did not affect any adjustments or delinquent returns".

Exam Results:

No formal criminal investigations were ever conducted by CI using the Whistleblower's information. SB/SE Exam's civil audits of [taxpayers 2 and 3] both closed as No Changes with no payments due from the companies. The SB/SE 1040 audit of the primary taxpayer resulted in Agreed tax deficiencies that were all determined directly from delinquent 1040 and amended tax returns provided by [taxpayer 1] as part of [taxpayer 1's] OVDI information. Per the Form 11369 narrative by the SB/SE examiner, none of the audit adjustments or assessments were connected to the Whistleblower's information.

Whistleblower Tax Law:

This claim denial is supported by IRC 7623(b)(1), which requires that the Whistleblower's information give rise to some administrative or judicial action that results in collected proceeds that are connected to the information. This claim for award resulted in no such actions and no collected proceeds that were attributable to the Whistleblower's information. The Whistleblower's information did not start any of the examinations of the primary taxpayer or his companies and did not significantly contribute to any of the issues raised or audit assessments against the taxpayers. Consequently, none of the collected proceeds from the taxpayers is attributable to the Whistleblower's information.

**[\*12]** After further communications with petitioner's counsel, who disagreed with the preliminary denial letter, on May 25, 2016, STA Chatham sent petitioner a final determination, which indicated that petitioner's claim for an award had been denied for the same reasons stated in the preliminary denial letter.

*Tax Court Proceedings*

Petitioner timely petitioned this Court to review the WBO's denial determination. Respondent filed a Motion for Summary Judgment, asserting that the IRS had not initiated any administrative or judicial action using petitioner's information and that, although the IRS had collected proceeds from the target taxpayers, these collections had not resulted from petitioner's information but rather from the target taxpayers' participation in the VDP. On September 19, 2017, this Court denied respondent's Motion for Summary Judgment, reasoning that we could not conclude, on the record then before the Court, that the IRS did not proceed with an administrative or judicial action using the information provided by petitioner and did not collect proceeds using petitioner's information. T.C. Memo. 2017-181.

*Discovery Dispute*

In response to petitioner's informal discovery requests, respondent produced 1,488 pages of documents. After unsuccessfully attempting further informal discovery, petitioner filed a Motion to Compel Production of Documents accompanied by the Unsworn Declaration of Stephanie K. McGuire Under Penalty of Perjury in Support of Motion to Compel Production of Documents. Petitioner's discovery motion seeks the following 36 categories of documents:

1. All documents used in respondent's response to petitioner's interrogatories.

2. Any "taint or risk analysis" memos prepared by respondent regarding petitioner's whistleblower claim.

3. Transcripts from the IRS Integrated Data Retrieval System for each of the tax years 2007 through 2016 for "each Non-Compliant Taxpayer and related taxpayers identified in the Petitioner's Whistleblower Claim

**[\*13]** . . . and supporting documents that are the subject of this litigation."[14]

4. For each of the tax years 2007 through 2016, copies of all narrative entries made into the Whistleblower Management Information Tracking System (ETRAK), including all attachments, for each of the "Non-Compliant Taxpayers (including related taxpayers identified in Petitioner's Whistleblower Claim and supporting documents)" but specifically requested with respect to the Non-Compliant Taxpayers listed in the Claim 211."

5. All documents included in the administrative file maintained by the IRS Whistleblower Analyst assigned to the case that were not included in the ETRAK system.

6. All IRS tax examination team notes "including but not limited to, the CI program, IRS OVDI/DVD, SB/SE exam team, and the IRS tax specialist regarding all interaction with the Non-Compliant Taxpayers" or their representatives, "as well as any other meetings between the IRS" and the "Non-Compliant Taxpayers" or their representatives.

7. All "history notes of the IRS tax examination team" with respect to the "Non-Compliant Taxpayers" for each of the tax years 2007 through 2016.

8. "Copies of all IRS Form 4549, Tax Adjustment(s), Revenue Agent Report(s), and/or Notice of Delinquency" issued to the "Non-Compliant Taxpayers" for each of the tax years 2007–16.

9. Copies of any "settlement agreement and/or closing agreements" entered into between respondent and "the Non-Compliant Taxpayer" for each of the tax years 2007–16.

---

[14] In petitioner's original formal discovery requests to respondent (as contained in petitioner's letter to respondent dated January 12, 2017), the term "Non-Compliant Taxpayer(s)" is defined broadly to include not only taxpayers 1, 2, and 3 but also the 23 "Other Potential Non-Compliant Taxpayer(s)" that had been named in the memorandum attached to petitioner's Form 211. By contrast, in the reference list of redacted information associated with petitioner's Motion to Compel Production of Documents, the term "Non-Compliant Taxpayer(s)" is defined as taxpayers 1, 2, and 3, while the other 23 taxpayers are sometimes identified as "Other potential Non-Compliant Taxpayers." The seeming discrepancy does not affect our analysis.

**[\*14]** 10. "Copies of any notice and/or demand made upon the Non-Compliant Taxpayer" for tax years 2007–16.

11. "Copies of any notices of deficiencies the Respondent issued to the Non-Compliant Taxpayer" for tax years 2007–16.

12. "Any and all documents regarding the Respondent's determination that the Non-Compliant Taxpayers qualified and/or met the IRS' criterion for inclusion in a voluntary disclosure program including but not limited to either Domestic Voluntary Disclosure ('DVD') or Offshore Voluntary Disclosure Initiative ('OVDI')."

13. "Any and all documents showing how, when, and what process the Respondent used to verify whether a whistleblower claim was filed involving the Non-Compliant Taxpayer before, during, or after approving their participation in the DVD and/or OVDI program(s)."

14. Any documents showing "CID and/or ___ [sic] request for approval" from the WBO regarding DVD/OVDI programs.

15. "Any and all documents illustrating the number of Whistleblower Claims submitted to the Respondent's Whistleblower Office from 2007 to the present wherein the Respondent allowed a Non-Compliant Taxpayer to participate in either the DVD and/or OVDI program even though a pre-existing Whistleblower Claim was filed against the Non-Compliant Taxpayers. For the purpose of this request, 'Non-Compliant Taxpayer(s)' includes all Non-Compliant Taxpayers (including but not limited to the Non-Compliant Taxpayers in this lawsuit) allowed to participate in either the DVD and/or OVDI programs during this time frame."

16. "Any and all documents regarding why the respondent elected to give priority to the Non-Compliant Taxpayers' alleged 'voluntary disclosure' which was submitted after Petitioner's Form 211 filing."

17. Any documents regarding "the lack of or pre-existence of any audit or investigation . . . that Respondent planned for each of the Non-Compliant Taxpayers for the year(s) identified by the Petitioner's Form 211."

18. "Any and all documents showing how the Respondent used the Petitioner's information to develop specific document requests or other inquiries to the Non-Compliant Taxpayers."

[*15] 19. Any documents showing how respondent used petitioner's information to "validate the completeness and accuracy of the Non-Compliant Taxpayers' responses to information requests."

20. "Any and all documents regarding the Respondent's decision to 'honor' the Non-Compliant Taxpayers' voluntary disclosure 'even though there was a whistleblower involved.'"

21. "Any and all documents regarding the Respondent's decision to disclose the existence of the Petitioner's whistleblower filing to the Non-Compliant Taxpayers, including all communications within the Commission and/or between the Commission and [the] Non-Compliant Taxpayer regarding either the existence of a whistleblower and/or turning over the whistleblower's information to the Non-Compliant Taxpayer so they can 'prepare returns.'"

22. Any documents "showing communications" between respondent and any representative of the "Non-Compliant Taxpayers."

23. Respondent's "entire examination file related to the Non-Compliant Taxpayers for all tax years" 2007–16.

24. "Any and all documents that Non-Compliant Taxpayers qualified and/or met the Respondent's criterion for inclusion in any voluntary disclosure program" including DVD and/or OVDI.

25. Any documents "illustrating Respondent's internal claim numbers tracking" petitioner's whistleblower claim.

26. Any "documents regarding the Non-Compliant Taxpayers in the Respondent's internal, whistleblower database used to track or review the Non-Compliant Taxpayers request or consideration for inclusion in any voluntary disclosure program, including" DVD and OVDI.

27. Any documents showing communications to or from the IRS regarding the "Non-Compliant Taxpayers'" request for inclusion in the DVD or OVDI, including all documents included with the "Non-Compliant Taxpayer's purported voluntary domestic disclosure submission."

28. Any documents showing any "Report of Foreign Bank and Financial Accounts ('FBAR') penalties and/or any other fines penalties or forfeitures" that were assessed against the "Non-Compliant Taxpayers" for tax years 2007–16.

[*16] 29.  Any documents showing taxes respondent collected from the "Non-Compliant Taxpayers" for tax years 2007–16.

30.  Any documents regarding respondent's CI investigation of the "Non-Compliant Taxpayers."

31.  Any documents regarding respondent's initiation of any audit, investigation, or examination of any of the 22 "other, potential Non-Compliant Taxpayers" identified in the materials submitted in support of the Form 211.

32.  Any documents "extending the statute of limitations" between respondent and the "Non-Compliant Taxpayers."

33.  "Any [and] all documents wherein the Respondent is currently monitoring the Non-Compliant Taxpayers' compliance with tax issues," including "any and all correspondence" regarding such monitoring.

34.  Any documents showing "all of the Respondent's internal projects, including updates to the Internal Revenue Manual (IRM), treasury regulations, and Notices to IRS examination agents that were started or begun after the submission" of petitioner's whistleblower claim.

35.  "Copies of all administrative files along with all documentation, emails, memorandums, etc., associated with the Respondent's projects identified in response to the preceding request."

36.  "Any final reports issued by any expert witness(es) that will testify on Respondent's behalf in the trial of this lawsuit."

Respondent objects to petitioner's Motion to Compel Production of Documents primarily on the grounds that he has already provided petitioner with a complete copy of the administrative record upon which the WBO based its determination and that this administrative record contains responsive documents relating to taxpayers 1, 2, and 3 for all the years referenced in petitioner's Form 211.  Respondent contends that even if additional responsive documents existed they would be protected, variously, as confidential return information under section 6103 or by the deliberative process privilege or attorney-client privilege.[15]  Insofar as petitioner's discovery requests relate to years

---

[15] In his Response to Motion to Compel Production of Documents, respondent clarifies that he has "neither identified nor withheld any specific documents on the grounds they are privileged.  Rather, respondent maintains that it has produced all responsive documents—the administrative record that was before the Whistleblower

**[\*17]** beyond 2010 (the last year expressly referenced in petitioner's Form 211) or to taxpayers that were neither referred by the WBO nor examined by the IRS, respondent objects that petitioner's request is overbroad. Respondent states that he is unable to produce the documents described in petitioner's requests numbered 1, 2, 14, 15, 18, 19, and 21 because "no such documents exist."

*Remand to WBO*

On May 8, 2019, the Court remanded this case to the WBO, finding that on the record then before us we were unable to adequately evaluate the challenged agency action. We ordered the WBO to further consider (1) whether the whistleblower's information caused the target taxpayers' entry into the VDP, either directly or indirectly, (2) whether the existence of a whistleblower or the whistleblower's information was disclosed to the target taxpayers, and (3) whether the whistleblower's information was used in the examination of the target taxpayers' voluntary disclosure. The Court ordered respondent to file a supplemental determination and held petitioner's Motion to Compel Production of Documents in abeyance.

*WBO's Supplemental Determination*

On January 30, 2020, respondent issued the WBO's Supplemental Determination, again denying petitioner's claim for a whistleblower award and stating in response to the three issues identified in the Court's remand order:

> (1) Your Whistleblower claim for award did not directly or indirectly cause [taxpayer 1] to enter the Voluntary Disclosure Program (VDP) nor to file . . . [a] VDP submission with the IRS.
>
> (2) The existence of a whistleblower was disclosed to [taxpayer 1] and [taxpayer 1's] representatives on or around 8/28/2012, but the identity of the whistleblower and the information in the claim for award filing were not disclosed. Further, it appears from information available that [taxpayer 1] and [taxpayer 1's] representatives did not correctly identify the whistleblower, and there is no evidence that this disclosure had any negative effects on

---

Office—that is necessary for the Tax Court to assess whether or not respondent properly evaluated petitioner's claim for an award."

**[*18]**  the [taxpayer 1's] examination case nor on the handling of your claim for award.

(3) Your claim for award information was reviewed and used during the examination of [taxpayer 1's] VDP filing. However, no examination adjustments, assessments, or proceeds resulted from the examiner's use of your information. Instead, all examination assessments and proceeds collected resulted from [taxpayer 1's] own VDP information including [taxpayer 1-]related delinquent and amended tax return filings.

The Supplemental Determination filed with the Court was accompanied by the Declaration of STA Chatham (Chatham declaration). STA Chatham declared under penalty of perjury that petitioner's whistleblower claim had been assigned to him for processing from April 2015 until the WBO denied petitioner's claim on May 25, 2016, and again after the Court remanded the case on May 8, 2019, until the issuance of the Supplemental Determination on January 30, 2020. He certified that the pages attached to his declaration (Bates-stamped 1–1722) constitute the complete administrative record.[16]

Included in the administrative record is a supplemental ARM from STA Chatham, explaining in detail his reasons for recommending denial of petitioner's award claim. The supplemental ARM states in part:

Based on Form 11369 information from both CI and SBSE Exam, this claim should be denied. CI did not take any formal investigative actions in response to the Whistleblower's claim. SB/SE did conduct an examination of the primary taxpayer and his controlled corporations but all tax assessments and proceeds collected resulted directly from the primary taxpayer's Voluntary Disclosure Program (VDP) information and from his own delinquent and amended tax returns. No significant audit actions or

---

[16] The Chatham declaration explains that the pages Bates-stamped 1–1488 constitute the administrative file created before the remand of this case to the WBO, and that the remaining pages Bates-stamped 1489–1722 constitute the administrative record created after the remand of this case to the WBO (supplemental record). Respondent's privilege log indicated that certain documents in the supplemental record attached to the Chatham declaration had been redacted or withheld for privilege.

**[\*19]** results can be connected to the Whistleblower's Form 211 information.

                    . . . .

After receiving the claim case files back from the Tax Court remand in June 2019, the [WBO] analyst reconsidered whether any audit adjustments (and resulting proceeds collected) from the SB/SE audit of [taxpayer 1] arose from or could be connected to any information or assistance from the Whistleblower's claim for award.

However, consistent with the original ARM memo and original claim denial letters, it must again be determined that none of the audit assessments or proceeds collected from the SB/SE examination can be reasonably connected to the Whistleblower's claim for award.

The original ARM memo provided detailed Form 11369 information from CI and SB/SE Exam as well as observations from the timeline of events for this claim case to support the denial of the Whistleblower's claim for award. These documents indicated that all audit adjustments and tax assessments related to the 2007–2010 examination of [taxpayer 1] were based on Voluntary Disclosure information from [taxpayer 1 and taxpayer 1's] representatives in addition to [taxpayer 1's] own delinquent Form 1040 return filings and related Form 1040X amended returns, not on any Whistleblower claim information. This ARM memo quoted the SB/SE Exam findings from the Form 11369 by RA Chris Martin stating, ". . . the delinquent and amended returns received (from [taxpayer 1 and taxpayer 1's] representatives) were accepted as filed as no omitted income was identified. The information provided by the Whistleblower did not affect any adjustments or delinquent returns". This memo further concluded, "SB/SE did conduct an examination of the [target taxpayers] but all tax assessments made and paid resulted directly from [taxpayer 1's] VDP information and from [taxpayer 1's] delinquent and amended tax returns. No significant audit actions or results can be connected to the Whistleblower's Form 211 information".

**[*20]** To check these original findings, the [WBO] analyst again reviewed the SB/SE Exam RA's case activity record as well as his case workpapers from his examination of [taxpayer 1]. He also contacted assigned SB/SE Exam Revenue Agent Chris R. Martin by both telephone and email message to secure additional and clarifying information surrounding his examination case on [taxpayer 1]. These audit documents all referenced the source of adjustments and tax assessments as [taxpayer 1's] own Voluntary Disclosure information and the delinquent 1040 and amended tax returns submitted by [taxpayer 1's] representatives. It is also noteworthy that no comments or assertions in the RA's audit case workpapers appeared to credit a source of information that could have been the Whistleblower's claim for award information. Per the Exam case workpapers provided and copies of the delinquent 1040 and amended tax returns for the 2007–2009 years, it is clear that the examiner accepted partial assessments of these taxpayer returns as they were prepared by the [taxpayer 1's] representatives and submitted to him. His audit workpapers also consistently cited "Forms 1040" as the source of the adjustments and tax assessments. No statements were found in the Form 11369 nor in any of the audit documents that indicated that any credit should go to the Whistleblower's claim information for any exam adjustments or tax assessments.

These original findings that led to the initial denial determination were again confirmed by an email response on 7/31/2019 from Revenue Agent Chris Martin. The RA recalled that he did consider the Whistleblower's claim for award information and did try to utilize parts of it in the taxpayer's examination case. However, this claim information could not be verified as accurate and all audit steps utilizing claim information resulted in no adjustments or tax assessments. With regard to [a particular transaction] mentioned in RA's phone call with the WO analyst on 7/31/2019, the RA stated, "Overall, the information provided by the whistleblower could not be substantiated. This is especially true of the large, $100 million contracts where [taxpayer 1] was supposed to have millions wired into [taxpayer 1's] accounts when the deal closed. It would appear that either these deals never closed

[*21] or [taxpayer 1] was not included in the final deal". During this phone call with the RA on 7/31/2019, he also stated that, during his audit work on [taxpayer 1], he never tried to contact the whistleblower or [the whistleblower's] representatives.

The RA's email response further confirmed that the Whistleblower's claim information was not used to determine any Exam adjustments or tax assessments when he stated in this email, "The whistleblower information was considered, and the RA tried to verify the items provided. Overall, the whistleblower information could not be verified. No adjustments were made as a result of the whistleblower information received". This conclusion also clearly supports the original claim denial determination previously made and issued to the Whistleblower and [the whistleblower's] representatives.

A final consideration was whether the Whistleblower's claim for award information could have directly or indirectly caused [taxpayer 1] to enter the VDP and to cooperate with the IRS. But, again the available information and documentation clearly indicates that the Whistleblower's information had no such effect on the taxpayer.

Firstly, the timeline of events in the Whistleblower's claim case fully supports the conclusion that the Whistleblower's claim information had no effect on [taxpayer 1's] decision to enter the VDP and to cooperate with the IRS. The Whistleblower's Form 211 claim for award was received by the W[B]O on 12/13/2010 but was not shared with any field OD [operating division] until this information was first referred to CI on 3/28/2011. Meanwhile, the taxpayer's VDP application package was received by CI on 1/27/2011, a full two months before the claim information was ever referred to CI. So, at the date that the taxpayer had submitted [taxpayer 1's] VDP package and it was accepted by CI, the Whistleblower's claim information was still held in the W[B]O and had not been referred to any field OD (i.e. CI or SB/SE Exam). Consequently, the taxpayer would have had no way to have learned about the claim

[*22] information from IRS before submitting [taxpayer 1's] VDP application.

The Form 11369 narrative provided by CI on the Whistleblower's case further supports the timeline of events and the observations above. It states, "Prior to receiving this referral from the WBO, taxpayer [1] requested to participate in the IRS Voluntary Disclosure Program. [Taxpayer 1] was cleared to enter the program at which point [the] request was referred to SB/SE Examination". The narrative continues, "CI received the Voluntary Disclosure request on January 27, 2011. Worked by SA (Special Agent) Denise Corcoran, Dallas FO. CI closed the Voluntary Disclosure as a direct referral to SB/SE on May 20, 2011. On July 26, 2011, (the assigned) CI (Special Agent actually) received the referral from the WBO. Taxpayer was already accepted into the program and referred to SB/SE." So CI received and worked on the taxpayer's VDP application a full 6 months before the referral of the Whistleblower's claim for award was ever assigned to a CI agent for consideration. This narrative of the facts therefore provides virtually no chance that the taxpayer found out about the Whistleblower's claim for award before coming forward and submitting [taxpayer 1's] VDP application for CI approval.

. . . .

In the W[B]O analyst's phone call with SB/SE Exam Revenue Agent Chris R. Martin on 7/31/2019, he confirmed many of the points above. RA Martin stated the taxpayer's attorneys . . . told him that the IRS letter on unfiled tax returns due from [taxpayer 2] caused [taxpayer 1] to come forward and enter the Voluntary Disclosure program in early 2011. At that time, the taxpayer's attorneys did not mention the Whistleblower . . . or any possible or suspected Whistleblower claim filing from [the whistleblower]. So the RA stands by his statements in his Form 11369 narrative regarding this point. In addition, RA Martin's email reply dated 7/31/2019 on this question further confirmed the conclusion that the Whistleblower's claim information had no effect on the taxpayer's decision to enter the VDP and to cooperate with the IRS.

[*23] The only way that that Whistleblower's claim for award information could have influenced the taxpayer to come forward, enter the VDP, and cooperate with the IRS would be if the taxpayer learned directly from the Whistleblower . . . or indirectly thru some other source apart from the IRS that [the whistleblower] was about to submit the claim information on [taxpayer 1] to the IRS and that news motivated [taxpayer 1] to quickly come forward with [taxpayer 1's] VDP application package. Such an incident, if it actually occurred, would have taken place sometime in November or December 2010. However, knowledge of any such incident is not available to the IRS, and there is no trace of information connected to this claim case that suggests that it did occur.

In conclusion, based on the information and observations provided above, it must [be] determined that none of the audit adjustments and proceeds collected from the VDP submission and the resulting examination of taxpayer [1] can be connected to the Whistleblower's claim for award information. Consequently, the Whistleblower's claim for award must be denied.

The supplemental ARM indicates that before the WBO issued its supplemental determination it shared a preliminary version with petitioner's representative, who responded in a letter dated January 3, 2020, expressing several points of disagreement. One of those points of disagreement regarded the timing and effect of the IRS's improper disclosure to the target taxpayers' representative, in August 2012, of the existence (but not the identity) of a whistleblower. The response letter asserted that this disclosure of a whistleblower was sufficient cause for the target taxpayers to file their delinquent returns and pay the delinquent taxes. The supplemental ARM rejected this argument, stating:

While the taxpayer did not submit his delinquent tax returns until 3/28/2013 (the received stamp date on each return), the taxpayer entered the VDP program back on 1/27/2011, a date well before the improper disclosure of a whistleblower was made. Entrance into the VDP program in January 2011 obligated [taxpayer 1] to file any and all amended and delinquent tax returns necessary to fully report [taxpayer 1's] personal tax liabilities and to fully pay

[*24] these taxes due. The disclosure of a whistleblower came well after this time and cannot be reasonably presumed to have motivated the taxpayer to file [taxpayer 1's] delinquent tax returns. In addition, the SB/SE Exam Revenue Agent in his Form 11369 has previously identified, based on his discussions with the taxpayer's representatives, the IRS letter dated 1/11/2011 to the taxpayer regarding nonfiled tax years by [taxpayer 2] as the specific motivation for [taxpayer 1's] entrance into the VDP program and for [taxpayer 1's] voluntary filing of delinquent personal tax returns and payment of taxes due. It is also important to note that the taxpayer was referred for civil audit in SB/SE for non-filed returns in early February 2012, well before the improper disclosure was made by the Exam group manager. Thus, the taxpayer was well obligated to file delinquent tax returns and pay [taxpayer 1's] taxes due before [taxpayer 1] ever found out about a whistleblower or informant. This fact makes any attempt to credit the improper disclosure of a whistleblower to the taxpayer for these proceeds both unreasonable and inaccurate.

The supplemental ARM also addressed arguments by petitioner's representatives regarding alleged abuses of discretion by the IRS in processing the target taxpayers' VDP request. The supplemental ARM stated:

Based on the WO analyst's telephone call with RA Chris Martin on 1/15/2020, the decision to accept and utilize the taxpayer's VDP filing was made by Brenda Perritt, his Exam group manager, shortly after the taxpayer's audit case was started in the RA's Exam group in August-September 2012. This decision to accept the taxpayer's VDP filing was totally outside the purview of the Whistleblower Office and had no direct effect on the outcome of the Whistleblower's claim for award. Further, it is very important to note that, while the Exam group did accept and utilize the VDP filing in conducting the taxpayer's 1040 audit case, it did not refuse to consider or use the Whistleblower's claim information. Rather, the RA has several times stated to the WO analyst that he did try to use the Whistleblower's claim information, but no audit adjustments resulted from using this information. For

**[*25]** example, see the large oil deal issue first mentioned above on page 3 that was considered from the Whistleblower's Form 211 and that ultimately resulted in no adjustment to the taxpayer's income. Thus, the Exam group never deliberately chose to use the taxpayer's VDP information to the exclusion of the Whistleblower's claim for award. Instead, both sources on information were considered during the taxpayer's examination, but all adjustments were ultimately derived from the taxpayer's information and from his own delinquent and amended return filings.

The fourth point in the response letter presents additional alleged "abuses of discretion" regarding the IRS's handling and acceptance of the taxpayer's VDP application. As is pointed out above for the third point, these processes and decisions made in the field are outside of the purview of the Whistleblower Office and cannot be used to award proceeds to the Whistleblower if the examiner in fact utilized the VDP information and delinquent/amended tax returns provided by the taxpayer to identify and develop tax adjustments instead of the claim for award information from the Whistleblower. Such is the situation in this case as has been consistently reported by the Revenue Agent in his Form 11369 as well as in later telephone and email inquiries by the WO analyst.

*Tax Court Proceedings After Supplemental Determination*

In response to the supplemental determination, petitioner filed a Supplemental Petition.[17]  On January 12, 2021, respondent filed a Motion for Summary Judgment supported by the Chatham declaration. In a Response and First Supplemental Response, petitioner opposed the granting of respondent's Motion for Summary Judgment and cross-moved for summary judgment.  Further briefing ensued.

---

[17] In response to the supplemental determination, petitioner also filed a Petition in a new case, Docket No. 4014-20W, which the Court subsequently closed as duplicative of the instant case.

**[\*26]**                                        *Discussion*

A.     *Jurisdiction*

Section 7623(b)(1) requires payment of an award to an individual (commonly referred to as a whistleblower) who provides information concerning underpayments of tax if the Commissioner, on the basis of that information, "proceeds with any administrative or judicial action" that results in the collection of proceeds. Section 7623(b)(4) provides, in relevant part, that this Court has jurisdiction over an appeal of "[a]ny determination regarding an award" under section 7623(b)(1). [18]

The U.S. Court of Appeals for the District of Columbia Circuit, to which any appeal of this case would ordinarily lie, *see* I.R.C. § 7482(b) (flush language), has confirmed that pursuant to section 7623(b)(4) this Court had jurisdiction over an appeal where the WBO referred a whistleblower's submission to another office of the IRS, which initiated an examination of the issue that the whistleblower had identified, and the WBO subsequently issued a determination denying the whistleblower any award, *Lissack v. Commissioner*, 68 F.4th 1312, 1320–21 (D.C. Cir. 2023) (distinguishing *Li v. Commissioner*, 22 F.4th 1014 (D.C. Cir. 2022) (holding that the Tax Court lacks jurisdiction over the appeal of a threshold rejection of a whistleblower claim where the IRS does not proceed with any relevant administrative or judicial action against the target taxpayers)), *aff'g* 157 T.C. 63 (2021); *see Berenblatt v. Commissioner*, No. 7208-17W, 160 T.C., slip op. at 12–13 (May 24, 2023); *Whistleblower 972-17W v. Commissioner*, 159 T.C. 1, 7–10 (2022). Similarly, in the case at hand, because the WBO referred petitioner's claim to another office of the IRS, which proceeded with administrative

---

[18] Section 7623(b)(5) provides in part that section 7623(b) applies if the proceeds in dispute exceed $2 million. This Court has held that the $2 million threshold is not jurisdictional but rather may create an affirmative defense that must be pleaded in the answer and proved by the Commissioner. *Lippolis v. Commissioner*, 143 T.C. 393 (2014). Although in his original Motion for Summary Judgment respondent asserted that the $2 million threshold of section 7623(b)(5)(B) had not been met in this case, in his most recent Motion for Summary Judgment respondent concedes that the threshold has been met because "the proceeds in dispute as alleged by petitioner exceeded $2 million." We accept respondent's concession without expressing any view on its legal correctness. *Cf.* Treas. Reg. § 301.7623-2(e)(2) (defining the "amount in dispute" as "the greater of the maximum total of tax, penalties, interest, additions to tax, and additional amounts that resulted from the action(s) with which the IRS proceeded based on the information provided, or the maximum total of such amounts that were stated in formal positions taken by the IRS in the action(s)").

**[\*27]** action, and the WBO subsequently issued a final award decision denying petitioner's claim, this Court has jurisdiction over this case. *See Whistleblower 972-17W*, 159 T.C. at 7–10; *McCrory v. Commissioner*, T.C. Memo. 2023-98, at \*7 n.5.

B.  *Standard and Scope of Review*

We review the WBO's determinations for abuse of discretion, generally confining our review to the administrative record. *Kasper v. Commissioner*, 150 T.C. 8, 20–23 (2018). In reviewing an appeal of the WBO's determination this Court "should have before it neither more nor less information than the [WBO] had when it made its determination." *Berenblatt*, 160 T.C., slip op. at 14 (citing *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013)).

The complete administrative record should contain "all the information [the WBO] considered directly or indirectly" in making its determination. *Van Bemmelen v. Commissioner*, 155 T.C. 64, 74 (2020) (quoting *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 114 (D.D.C. 2009)). The WBO is generally presumed to have properly compiled the administrative record. *Id.* To overcome this presumption requires "a substantial showing . . . with clear evidence" that documents sought to be included in the record before the court were in fact considered by the WBO, directly or indirectly, when it made its decision. *Id.* (first citing *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019); and then citing *Cape Hatteras Access Pres. All.*, 667 F. Supp. 2d at 114).

Treasury Regulation § 301.7623-3(e) describes the materials that should be included in the administrative record relating to a whistleblower determination:[19]

> Treas. Reg. § 301.7623-3(e) Administrative record.
> (1) In general. The administrative record comprises all information contained in the administrative claim file that is relevant to the award determination and not protected by one or more common law or statutory privileges.

---

[19] This regulation applies to this case because petitioner's claim for an award was open as of August 12, 2014, when the regulation became effective. *See Berenblatt*, 160 T.C., slip op. at 11 n.5; Treas. Reg. § 301.7623-3(f).

**[\*28]**     (2) Administrative claim file.  The administrative claim file will include the following materials relating to the action(s) to which the determination relates—

(i) The Form 211, "Application for Award for Original Information," filed by the whistleblower and all information provided by the whistleblower (whether provided with the whistleblower's original submission or through a subsequent contact with the IRS).

(ii) Copies of all debriefing notes and recorded interviews held with the whistleblower (and the whistleblower's legal representative, if any).

(iii) Form(s) 11369, "Confidential Evaluation Report on Claim for Award," including narratives prepared by the relevant IRS office(s), explaining the whistleblower's contributions to the actions and documenting the actions taken by the IRS in the case(s). The Form 11369 will refer to and incorporate additional documents relating to the issues raised by the claim, as appropriate, including, for example, relevant portions of revenue agent reports, copies of agreements entered into with the taxpayer(s), tax returns, and activity records.

(iv) Copies of all contracts entered into among the IRS, the whistleblower, and the whistleblower's legal representative (if any), and an explanation of the cooperation provided by the whistleblower (or the whistleblower's legal representative, if any) under the contract.

(v) Any information that reflects actions by the whistleblower that may have had a negative impact on the IRS's ability to examine the taxpayer(s).

(vi) All correspondence and documents sent by the Whistleblower Office to the whistleblower.

(vii) All notes, memoranda, and other documents made by officers and employees of the Whistleblower Office and considered by the official making the award determination.

(viii) All correspondence and documents received by the Whistleblower Office from the whistleblower (and the whistleblower's legal

**[*29]**     representative, if any) in the course of the whistleblower administrative proceeding.

(ix) All other information considered by the official making the award determination.

C.   *Discovery Standard*

In *Berenblatt*, 160 T.C., slip op. at 18, this Court clarified the discovery standard that applies in a whistleblower proceeding in this Court:

> [W]e hold that whistleblower discovery requests are appropriate upon a significant showing that (1) there is material in the IRS's possession indicative of bad faith on the IRS's part in connection with the case or (2) there is material in the IRS's possession indicating that the designated record omits material the WBO actually considered (directly or indirectly) or that otherwise falls under a category listed in Treasury Regulation § 301.7623-3(e).

The Court also stated: "For purposes of evaluating whether a whistleblower has made a significant showing . . . of an incomplete record, we will deem all materials listed in Treasury Regulation § 301.7623-3(e) to be necessary parts of the complete record."  *Id.* at 16–17.

D.   *Petitioner's Motion to Compel Production of Documents*

Petitioner's Motion to Compel Production of Documents seeks documents in 36 broad categories, covering primarily the target taxpayers, although at least some of the requests (e.g., those numbered 3, 4, and 31) appear also to cover most if not all of the 23 other "potential Non-Compliant Taxpayers" identified in the attachment to petitioner's Form 211.  These discovery requests generally span the years 2007 through 2016.

Respondent objects to the granting of petitioner's motion, asserting that he has already produced the administrative claim file that contains "the universe of documents before the Whistleblower Office at the time respondent made his determination in this case." Respondent asserts that further discovery is unwarranted because the documents that petitioner seeks through discovery have already been provided, do not exist, or are outside the scope of the administrative

**[*30]** record and protected, variously, as confidential return information under section 6103 or by the deliberative process privilege or by attorney-client privilege.[20] Moreover, respondent objects that petitioner's discovery requests are overly broad and unduly burdensome insofar as they relate to (1) tax years that were not placed at issue in petitioner's claim and were outside the years audited by the IRS or (2) the other "potential Non-Compliant Taxpayers" as to which the WBO has made no determination.

At the Court's direction, the parties have provided supplemental briefing on various discovery issues, including *Berenblatt*'s effect on the proper disposition of petitioner's Motion to Compel Production of Documents.

1.    *Overbreadth of Discovery Requests*

We agree with respondent that petitioner's discovery requests are overly broad and unduly burdensome insofar as they relate to entities or persons other than the target taxpayers or to tax years other than those for which the IRS proceeded with examinations on the basis of petitioner's information (for simplicity, collectively, other taxpayers or years). Although petitioner's claim submission identified 25 entities and individuals as having some possible connection with or knowledge of taxpayer 1's business activities, the submission provided specific information only with respect to the three target taxpayers and two other flowthrough entities, for the years 2007 through 2010. The WBO initially made referrals to CI and SB/SE only for petitioner's claims relating to taxpayer 1. During SB/SE's examination, taxpayers 2 and 3 were associated with the claim. Taxpayer 1 was audited for tax years 2007–10; taxpayer 2 was audited for tax years 2006–09; and taxpayer 3 was audited for tax years 2007–09. The record shows that for these years the IRS collected taxes remitted pursuant to the delinquent and amended tax returns that taxpayers 1, 2, and 3 filed for tax years 2007 through 2010. There is no hint in the record that the IRS proceeded

---

[20] Respondent represents that, with respect to that portion of the designated administrative record created before this Court's remand to the WBO, respondent had "neither identified nor withheld any specific documents on the grounds they are privileged." With respect to the supplemental record created after this Court's remand, respondent provided a privilege log indicating that certain documents had been withheld or redacted. Petitioner has not expressly challenged these privilege claims as they relate to the supplemental record, and our ruling today does not necessitate an evaluation of these privilege claims.

**[\*31]** with any action against other taxpayers on the basis of petitioner's information.

Petitioner has offered no meaningful theory under which documents relating to other taxpayers or years are relevant for our review of the WBO's award determination. Documents relating to other taxpayers or years were not part of the administrative record that the WBO developed or collected as part of its administrative process. Petitioner has failed to rebut the strong presumption that respondent properly excluded such documents from the designated record. We decline to sanction a fishing expedition for such documents.

### 2. *Completeness of Form 11369 Packages*

Petitioner argues that the requested discovery is warranted because the record produced by the IRS is incomplete, lacking materials that petitioner believes should have been included with the Forms 11369 that CI and SB/SE forwarded to the WBO upon concluding their investigations. In support of this position, petitioner cites IRM 25.2.1.5.5.1 (Jan. 11, 2018), which lists various types of documentation to be included in the "Form 11369 Package." These IRM directives did not become effective, however, until January 11, 2018, well after CI sent its Form 11369 package to the WBO on February 3, 2012, and well after SB/SE sent its Form 11369 package to the WBO on October 1, 2014. Consequently, these IRM directives were not in effect at any time relevant to this proceeding.[21] Rather than looking to these IRM directives, pursuant to the holding in *Berenblatt* we look to Treasury Regulation § 301.7623-3(e)(2)(iii), which was in effect at all relevant times.

As noted, Treasury Regulation § 301.7623-3(e)(2)(iii) states that the administrative claim file should include any Form 11369 prepared with respect to the whistleblower's case, "including narratives prepared by the relevant IRS office(s), explaining the whistleblower's contributions to the actions and documenting the actions taken by the

---

[21] We express no view on the potential relevance of these IRM directives had they been in effect at any relevant time. Although IRM provisions may be "instructive in ascertaining the procedures the IRS expects its employees to follow," *Wadleigh v. Commissioner*, 134 T.C. 280, 294 (2010), it is "well-settled" that IRM provisions are "directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law," *Marks v. Commissioner*, 947 F.2d 983, 986 n.1 (D.C. Cir. 1991), *aff'g* T.C. Memo. 1989-575; *accord Weiss v. Commissioner*, 147 T.C. 179, 196 (2016) ("The IRM lacks the force of law and does not create rights for taxpayers."), *aff'd*, No. 16-1407, 2018 WL 2759389 (D.C. Cir. May 22, 2018).

**[\*32]** IRS in the case(s)." The designated administrative record that respondent has submitted satisfies this requirement. It contains four Forms 11369—one that CI forwarded to the WBO and three that SB/SE subsequently forwarded to the WBO. The Form 11369 that CI forwarded to the WBO pertains only to taxpayer 1 and explains that CI had received the VDP request and referred it to SB/SE before receiving the whistleblower claim referral from the WBO.[22] After conducting its examination, SB/SE forwarded to the WBO three largely identical Forms 11369 for the target taxpayers. Each Form 11369 describes the actions taken by SB/SE and states that no audit adjustments or assessments were connected with the information in petitioner's whistleblower claim. These narratives explain that all tax assessments against taxpayer 1 resulted directly from the taxes reported on taxpayer 1's delinquent and amended tax returns, and that the audits of taxpayers 2 and 3 were closed as "No Changes" with no tax payments due.

In addition to requiring that the administrative claim file include Forms 11369 and accompanying narratives, Treas. Reg. § 301.7623-3(e)(iii) states: "The Form 11369 will refer to and incorporate additional documents relating to the issues raised by the claim, as appropriate, including, for example, relevant portions of revenue agent reports, copies of agreements entered into with the taxpayer(s), tax returns, and activity records."[23] We are satisfied that the Form 11369 packages included in the designated record also meet this requirement. For taxpayer 1 the SB/SE Form 11369 package includes Form 4549 for tax years 2007–10, with accompanying schedules; relevant portions of taxpayer 1's Forms 1040 and 1040X; and Examining Officer Martin's Activity Record and workpapers. For taxpayers 2 and 3 the SB/SE Form 11369 packages include Forms 4549–A, indicating "NO CHANGE"; relevant portions of Forms 1120 and 1120X; and Workpapers 400, indicating that the delinquent returns of taxpayers 2 and 3 were "accepted as filed." *See supra* note 13. Petitioner has not overcome the presumption of correctness that the Form 11369 packages included in the designated administrative record meet the requirements of Treasury Regulation § 301.7623-3(e)(2)(iii).

---

[22] CI did not prepare separate Forms 11369 for taxpayers 2 and 3, which were associated with petitioner's whistleblower claim only after the WBO subsequently referred it to SB/SE.

[23] This regulation "does not explicitly include all such 'additional documents' in the record." *Berenblatt*, 160 T.C. at 21 & n.8.

**[\*33]**  In short, we are unpersuaded by petitioner's argument that the designated administrative record is incomplete for failure to include documents that fall under a category listed in Treasury Regulation § 301.7623-3(e).

### 3.  *VDP Materials*

In supplemental briefing addressing *Berenblatt*'s effect on petitioner's Motion to Compel Production of Documents, petitioner focuses mainly on the target taxpayers' VDP submission and materials relating to respondent's decision to honor it (collectively, VDP materials)—items encompassed in petitioner's document production requests numbered 12, 16, 20, 24, 26, and 27. Petitioner contends that the VDP materials are discoverable because (1) the WBO considered these materials and consequently they should be included in the administrative record or (2) alternatively, the VDP materials are extrarecord evidence with which the administrative record should be supplemented.  We address these arguments in turn.

### a.  *Incomplete Record*

Petitioner suggests that the VDP materials are discoverable as potentially relevant materials that should have been included in the administrative record.  An agency, however, is "not obligated to include [in the administrative record] every potentially relevant document existing within its agency.  Only those documents that were directly or indirectly considered by the [agency's] decisionmaker(s) should be included in the administrative record." *Pac. Shores Subdiv. Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 7 (D.D.C. 2006). "[A]bsent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity, that it properly designated the administrative record." *Id.* at 5.  The relevant question is whether petitioner has provided "concrete evidence . . . that the specific documents allegedly missing from the administrative record were directly or indirectly *considered* by the *actual decision makers* involved in the challenged agency action." *Dist. Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013) (emphasis added), *aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015).

Petitioner does not expressly contend that the WBO considered the VDP materials *directly*.  Indeed, the record does not suggest that any of the VDP materials were ever forwarded to or collected by the WBO, which relied instead on the Forms 11369 and supporting

**[\*34]** documentation provided by CI and SB/SE. Complete copies of these Forms 11369 and supporting documentation are already contained in the designated administrative record.

Petitioner contends, however, that the WBO "indirectly considered" the VDP materials. As one court has aptly observed, "it is not entirely clear what it means to *indirectly* consider documents or materials." *Amgen Inc. v. Hargan*, 285 F. Supp. 3d 397, 404 (D.D.C. 2017) (treating the "indirect consideration" concept as "captur[ing] materials that are necessary to understand the documents that the agency *directly* relied upon" and denying motion to supplement the administrative record with documents intended to test a decision by the Food and Drug Administration for consistency with previous decisions). The caselaw provides no general test.[24] But it does suggest some guiding principles. One court has observed that if an agency's final decision was based "on the work and recommendations of subordinates, those materials should be included as well." *Amfac Resorts, L.L.C. v. U.S. Dep't. of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (collecting cases), *aff'd in part, rev'd in part* 282 F.3d 818 (D.C. Cir. 2002), *vacated in part sub nom. Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003). On the other hand, it is not always necessary to include in the administrative record source information upon which agency staff relied in making their recommendations to the agency decisionmakers if other information in the record obviates the need to consider the source information independently. *See, e.g.*, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (affirming denial of discovery and record supplementation with respect to source documents that bank examiners had relied upon in making their bank-insolvency reports to the Comptroller of the Currency, where "detailed contemporaneous reports from the examiner-in-charge and members of her examination team explain[ed] how and why they reached their conclusions regarding the banks' reserves"); *Cape Hatteras Access Pres. All.*, 667 F. Supp. 2d at 114 (denying motion to supplement the record with a biological report that the National Park Service had relied upon

---

[24] *See* Daniel J. Rohlf, *Avoiding the "Bare Record": Safeguarding Meaningful Judicial Review of Federal Agency Actions*, 35 Ohio N.U. L. Rev. 575, 584 (2009) ("[C]ourts have not set forth a general test for assessing what constitutes an agency's 'indirect' consideration of documents or other information, so judges have broad latitude to decide this issue in the context of the factual circumstances of individual cases."); *see also* Aram A. Gavoor & Steven A. Platt, *Administrative Records and the Courts*, 67 U. Kan. L. Rev. 1, 33 (2018) (stating that the indirect consideration concept "does not appear to have a principled origin. Indeed, there is no clear meaning as to what it means for a decisionmaker to have 'indirectly' considered materials.").

**[\*35]** in developing an interim strategy that was before the Fish and Wildlife Service when it designated certain critical habitats, even though the biological report was referenced by several other documents in the administrative file).

In *Berenblatt*, 160 T.C., slip op. at 19–21, this Court denied requested discovery of certain interview documents and subpoenaed financial records that the IRS had obtained before the whistleblower initially provided information to the IRS in an interview. The CI special agent who had interviewed the whistleblower referenced these documents in his Form 11369 narrative, but they were not included in the designated administrative record. This Court rejected an argument that because these documents had been available to the CI special agent when he completed the Form 11369, they had been indirectly considered in reaching a decision on the whistleblower's award claim. The Court reasoned that the decisionmakers for the whistleblower's claim were the relevant WBO personnel and not the CI special agent who prepared the Form 11369. *Id.* at 19. The Court observed: "If *any* potentially available document in the IRS's possession at the time the WBO made its decision were discoverable, that would render the record rule all but meaningless." *Id.* at 20. The Court further stated that discovery of items available to the CI special agent were "limited to those relevant to [the whistleblower's] contribution to the ongoing investigation and generally does not extend to those created before his interview." *Id.*

In the instant case, CI received the target taxpayers' VDP application and forwarded it to SB/SE weeks before receiving petitioner's complete Form 211 package and forwarding it to a CI analyst for consideration. It was many months later that the WBO, upon learning that CI had ultimately declined to pursue the matter, forwarded petitioner's whistleblower information to SB/SE. Nothing in the record suggests that the VDP materials were "relevant to [the whistleblower's] contribution to the ongoing investigation." *Id.* As the record makes clear, the only tax collections resulting from the investigation of the target taxpayers were attributable to the taxes that they reported on their delinquent and amended income tax returns and not to any information that petitioner provided.

Similarly, the references to the target taxpayers' VDP application as contained in SA Chatham's ARMs do not compel the conclusion that the VDP materials were before the WBO in making its decision. As the ARMs make clear, this information was obtained from the Forms 11369 that CI and SB/SE forwarded to the WBO. The mere reference to the

**[\*36]** VDP application in these documents does not necessarily make it part of the record. *See Berenblatt*, 160 T.C., slip op. at 21 n.8; *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 79 (D.D.C. 2018) ("[T]he mere mention of a document in the agency's decision or the record does not always mean, *ipso facto*, that the agency considered the document." (citing *Franks v. Salazar*, 751 F. Supp. 2d 62, 69 (D.D.C. 2010))). There is a difference between an agency's citing a document for a substantive proposition, which may indicate that the agency actually considered the document in making its decision, and merely referencing a document's existence, which is insufficient, on its own, to show consideration. *Oceana*, 290 F. Supp. 3d at 80; *see also Marcum v. Salazar*, 751 F. Supp. 2d 74, 80 (D.D.C. 2010) ("[R]eferences to documents in the administrative record do not prove that that the documents were 'before' the deciding agency."); *WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 6 (D.D.C. 2009) ("Although citation to a document may . . . indicate consideration of the contents of the document, the fact that a document is merely mentioned does not lead to the same conclusion."); *Cape Hatteras Access Pres. All.*, 667 F. Supp. 2d at 114 (stating that multiple references in the record to a biological report did "not prove that it was before the agency when it made its decision").

The decisionmakers for petitioner's award claim were STA Chatham and his colleagues in the WBO, not the IRS field personnel who considered the VDP request. *See Berenblatt*, 160 T.C., slip op. at 19; *see also* IRM 25.2.1.1.2(2) and (3) (Mar. 10, 2023) ("The authority to determine and approve awards under IRC 7623 . . . is delegated to the Director of the W[B]O . . . . The operating divisions do not have authority to determine or approve awards under IRC 7623."). Nothing in the record suggests that the WBO actually considered the substantive contents of the target taxpayers' VDP application or of any other VDP materials in making its decision to deny petitioner's award claim. As stated in SA Chatham's supplemental ARM: "This decision to accept the taxpayer's VDP filing was totally outside the purview of the Whistleblower Office and had no direct effect on the outcome of the Whistleblower's claim for award." In these circumstances the references to the target taxpayers' VDP application in the ARMs and Forms 11369 are insufficient to overcome the presumption that the WBO properly designated the record. *See Cape Hatteras Access Pres. Alliance*, 667 F. Supp. 2d at 114.

Petitioner suggests that discovery of the VDP materials is necessary because respondent's actions are not adequately explained in the administrative record. Petitioner posits various "mysteries"

**[*37]** involving the IRS's decision to honor the target taxpayers' VDP request—why the IRS accepted a VDP request that was allegedly incomplete, disclosed the existence of a whistleblower to the target taxpayers' representative, and ultimately honored the VDP request even though it was submitted after petitioner had submitted the Form 211. The relevant question in this whistleblower proceeding, however, is not whether the IRS properly processed or honored the target taxpayers' VDP request—again, a question outside the purview of the WBO—but whether the WBO abused its discretion in denying petitioner's award claim. That question is the crux of this case, and we address it below in evaluating the substantive merits of this case rather than as part of our consideration of petitioner's discovery motion.

b.     *Extrarecord Evidence*

Alternatively, petitioner contends that respondent should be required to produce the VDP materials as extrarecord evidence. In support of this discovery request, petitioner points to the holding of the U.S. Court of Appeals for the District of Columbia Circuit that extrarecord evidence may be consulted in these three "unusual circumstances":

> (1) if the agency "deliberately or negligently excluded documents that may have been adverse to its decision," (2) if background information was needed "to determine whether the agency considered all the relevant factors," or (3) if the "agency failed to explain administrative action so as to frustrate judicial review" . . . .

*City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)).

In *Berenblatt*, 160 T.C., slip op. at 18, this Court observed that the standards set forth in *City of Dania Beach* expressly apply to a request to supplement the record with extrarecord evidence rather than to a request for discovery of such evidence. *Berenblatt* left open the question of "whether discovery is appropriate to uncover extra-record evidence." *Id.*

Other courts that have addressed discovery of extrarecord evidence have applied a standard that is slightly different from that articulated in *City of Dania Beach*, although the standards are similar and to a degree overlapping. Under this discovery standard the party seeking discovery must make a "significant showing . . . that it will find

**[\*38]** material in the agency's possession indicative of bad faith or an incomplete record." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *see also Amfac Resorts, L.L.C.*, 143 F. Supp. 2d at 12.

Applying this discovery standard, we conclude that petitioner has not made a significant showing that discovery of the VDP materials is merited on the basis of bad faith on the part of the WBO.[25] Rather, petitioner contends that the VDP materials fall within the second category of permissible extrarecord evidence as articulated in *City of Dania Beach*. More particularly, petitioner contends that the VDP materials constitute background information needed to determine whether the WBO considered all relevant factors. In support of this argument, petitioner asserts that petitioner's complete information had been submitted to the IRS, and the target taxpayers had been notified of the existence of a whistleblower, before the target taxpayers provided documents, filed returns, and paid taxes. Discovery is not necessary, however, to establish these undisputed facts, which are acknowledged and addressed in the materials included in the designated administrative record. *See Lissack v. Commissioner*, 68 F.4th at 1327 (rejecting need for discovery "to support an already-accepted factual premise").

Moreover, construing petitioner's argument broadly as directed to the question of whether discovery of the VDP materials is merited as indicative of an incomplete record, we conclude that petitioner has failed to make the requisite significant showing in this regard. SA Chatham's detailed reports to the WBO address the processing of the VDP request and thoroughly explain the basis for concluding that petitioner's information did not lead to the collection of proceeds from the target taxpayers. As those reports make clear, the only tax proceeds collected from the target taxpayers were directly attributable to their tax reporting on their delinquent returns rather than to the VDP materials

---

[25] Alluding to the first and third categories of permissible extrarecord materials as articulated in *City of Dania Beach*, petitioner states that "[u]ntil discovery is complete it is difficult to determine" if the WBO has deliberately or negligently excluded documents or attempted to frustrate judicial review. Construing this statement broadly as directed toward the question of bad faith, we nevertheless find that petitioner has failed to make a "strong showing of [agency] bad faith." *Dist. Hosp. Partners, L.P.*, 786 F.3d at 54 (quoting *James Madison Ltd. by Hecht*, 82 F.3d at 1095). Indeed, petitioner has provided, and we discern, no reason to infer bad faith by the WBO.

**[\*39]** per se. And because the relevant portions of the target taxpayers' tax returns are already included in the record, it is unclear "how judicial review could be any more effectual" if the VDP materials were included in the record. *Cape Hatteras Access Pres. All.*, 667 F. Supp. 2d at 115.

In short, petitioner has not made a significant showing of an incomplete record so as to merit discovery of the VDP materials that SA Chatham may have relied upon as source materials in making his reports and representations to the WBO decisionmakers. *See James Madison Ltd. by Hecht*, 82 F.3d at 1095 (affirming denial of discovery and record supplementation with respect to source documents that bank examiners had relied upon in making their bank-insolvency reports to the Comptroller of the Currency, where "detailed contemporaneous reports from the examiner-in-charge and members of her examination team explain[ed] how and why they reached their conclusions regarding the banks' reserves"); *see also Dist. Hosp. Partners, L.P.*, 786 F.3d 46 (denying supplementation of the administrative record with source data used by agency staff in their report to the Secretary of Health and Human Services setting Medicare reimbursement rates). As explained in *FDIC v. Bank of Am., N.A.*, No. 17-00036, 2020 U.S. Dist. LEXIS 85468, at \*17–18 (D.D.C. Jan. 27, 2020) (denying supplementation of the administrative record with source data underlying staff reports that were part of the administrative record):

> The logic of *District Hospital Partners* and *James Madison* flows from the nature of agency decision-making. Agency staff across the federal government, as a matter of course, generate a considerable amount of work product every day. Agency decisionmakers then rely on some, but not all, of this work product in agency rulemaking and enforcement. As a general matter, it is far from unusual for an agency to rely on summaries of staff work product without looking at the source information upon which staff relied. Source information upon which staff, but not agency decisionmakers, rely is therefore not necessary "background information in order to determine whether the agency considered all of the relevant factors[.]" *Dist. Hosp. Partners*, 786 F.3d at 55. To supplement the record with such information "would render judicial review meaningless" by flooding courts with information that decisionmakers did not actually consider. *Pac. Shores*, 448 F. Supp. 2d at 5.

**[\*40]** Such concerns are no less salient in this whistleblower case in which, as discussed below, we must also be mindful of concerns about unnecessary disclosure of third-party tax information—such as the VDP materials—that might result from overly permissive discovery.

4.     *Other Document Production Requests*

Apart from making the arguments addressed above, petitioner has not meaningfully explained which of respondent's specific discovery responses petitioner believes to be inadequate or why. Petitioner's Motion to Compel Production of Documents and supporting papers do, however, make at least passing references to some particular discovery requests, which we address below.

Petitioner's document production request numbered 9 seeks "[c]opies of any settlement agreement and/or closing agreements entered between the respondent and the Non-Compliant Taxpayer for each of the tax years [2007–16]." The designated administrative record indicates that for the years that are the subject of petitioner's award claim and the WBO's determination the examining agent accepted the target taxpayers' Forms 1040 and 1040X as filed. Respondent asserts, and we agree, that the record does not suggest the existence of any other settlement agreement or closing agreement for these years. For reasons already discussed, insofar as petitioner's document production request seeks materials relating to other taxpayers or other years, it is overly broad and unduly burdensome.

Petitioner's document production request numbered 28 seeks copies of documents relating to any "Foreign Bank and Financial Accounts ('FBAR') penalties and/or any other fines, penalties or forfeitures [that] were assessed against and collected from the Non-Compliant Taxpayers for the tax years identified in the Form 211 through and including [December 31, 2016]." Petitioner suggests that this discovery request directly relates to the amount of collected proceeds under section 7623(b)(1). The designated administrative record contains IRS transcripts and Forms 4549 and 4549–A for the target taxpayers, all indicating that the only penalties assessed against them for the relevant years were accuracy-related penalties assessed against taxpayer 1 under section 6662. For reasons already discussed, insofar as this discovery request relates to other taxpayers or years, it is overly broad and unduly burdensome.

**[*41]** We also agree with respondent that petitioner's requested discovery is overly broad and unduly burdensome as relates to document production request numbered 34, seeking "[a]ny and all documents showing all of the Respondent's internal projects, including updates to the Internal Revenue Manual (IRM), treasury regulations, and Notices to IRS examination agents that were started or begun after the submission of Petitioner's Form 211 Claim," and document production request numbered 35, seeking "Copies of all administrative files along with all documentation, emails, memorandums, etc., associated with the Respondent's projects identified in response to the preceding request." These materials do not fall within any category listed in Treasury Regulation § 301.7623-3(e), and petitioner has not demonstrated they would be indicative of bad faith on the IRS's part, that they were actually considered by the WBO, directly or indirectly, in connection with this case, or, more generally, that they are relevant for deciding any issue in this case.

Respondent asserts, and petitioner has not expressly disputed, that certain of the documents petitioner has requested (in document production requests numbered 1, 2, 14, 15, 18, 19, and 21) do not exist. We cannot compel discovery of nonexistent documents. *See Berenblatt*, 160 T.C., slip op. at 23.

5.  *Section 6103 Privacy Protections*

Most of the documents that petitioner seeks to discover constitute third-party tax return information. Section 6103(a) provides that tax returns and return information generally must be kept confidential unless disclosure is specifically authorized by the Code. Section 6103(h)(4) authorizes disclosure in certain circumstances involving a judicial or administrative proceeding.[26] The parties disagree as to

---

[26] Section 6103(h)(4) provides:

A return or return information may be disclosed in a Federal or State judicial or administrative proceeding pertaining to tax administration, but only—

(A) if the taxpayer is a party to the proceeding, or the proceeding arose out of, or in connection with, determining the taxpayer's civil or criminal liability, or the collection of such civil liability, in respect of any tax imposed under this title;

(B) if the treatment of an item reflected on such return is directly related to the resolution of an issue in the proceeding; [or]

(C) if such return or return information directly relates to a transactional relationship between a person who is a party

**[\*42]** whether section 6103(h)(4) authorizes disclosure of the various documents that petitioner seeks to discover.

This Court has held that section 6103(h)(4)(A) permits disclosure of returns and return information that the WBO includes in the administrative record supporting its award determination. *Whistleblower 972-17W*, 159 T.C. at 22. The Court stated:

> [T]he information available in a whistleblower case generally will be limited to the administrative record the WBO develops or a properly supplemented record, because that is the record that is subject to the Court's review. Nothing in section 6103(h)(4)(A) or our holding gives whistleblowers license to seek returns or return information that the WBO did not collect as part of its administrative process. That such documents might exist in the hands of the IRS generally or in the files of an examination team that audited a target taxpayer does not (without more) make those documents part of the administrative record . . . .

*Id.* at 23 (citations omitted).

Accordingly, absent a showing that the documents petitioner seeks to discover are part of a properly supplemented administrative record, it is unnecessary to opine on the hypothetical application of the disclosure authorizations of section 6103(h)(4) to petitioner's requested discovery.

6. *Conclusion About Motion to Compel Production of Documents*

In conclusion, petitioner has failed to overcome the presumption that the WBO has properly compiled the administrative record. Petitioner has not made a significant showing that respondent exercised bad faith in compiling it, nor has petitioner made a significant showing that it omits material that the WBO actually considered, directly or indirectly, or material that otherwise falls under a category listed in Treasury Regulation § 301.7623-3(e). Furthermore, petitioner has not demonstrated the applicability of any of the narrow exceptions to the

---

to the proceeding and the taxpayer which directly affects the resolution of an issue in the proceeding . . . .

**[\*43]** record rule that would permit extrarecord evidence to be consulted in this case. Consequently, we will deny petitioner's Motion to Compel Production of Documents.

E.  *Evidentiary Objections*

Petitioner contends that the Chatham declaration, which respondent submitted in support of his second Motion for Summary Judgment, fails to properly authenticate the exhibits appended to it and fails to lay the necessary evidentiary foundation. We disagree. The exhibits in question are properly authenticated by the sworn declaration of STA Chatham, made on personal knowledge, as constituting "the complete administrative record." In accordance with Rule 121(c)(4), the declaration shows affirmatively that STA Chatham was the WBO analyst who processed and managed petitioner's whistleblower claim for the WBO's initial denial determination and subsequently upon remand from this Court. This declaration complies with Rule 121(c)(4) as a proper declaration to support a motion for summary judgment. *See Levin v. Commissioner*, T.C. Memo. 2018-172, at \*28–30, *aff'd*, 804 F. App'x 833 (9th Cir. 2020).

We also reject petitioner's objection that "a good majority" of the exhibits constitute hearsay. Respondent has submitted all these documents in support of his Motion for Summary Judgment, not to prove the truth of their contents but to show what documents STA Chatham relied on in deciding to deny petitioner's whistleblower claim. Accordingly, we overrule the hearsay objection. *See id.*; *see also Marino v. Commissioner*, T.C. Memo. 2021-130, at \*21 (holding that this Court reviews the administrative record in a whistleblower case "without regard to whether it might include evidence that would be inadmissible as hearsay in a trial de novo"); *Whistleblower 23711-15W v. Commissioner*, T.C. Memo. 2018-34, at \*18 n.9 (overruling hearsay objection with respect to contents of a Form 11369 attached to a declaration in support of a motion for summary judgment in a whistleblower case).

F.  *Cross-Motions for Summary Judgment*

1.  *Summary Judgment Standard*

Both parties have moved for summary judgment under Rule 121. Ordinarily, under Rule 121(a)(2) the Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. *Sundstrand Corp. v.*

**[\*44]** *Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). However, this summary judgment standard is "not generally apt where we must confine ourselves to the administrative record to decide whether there has been an abuse of discretion." *Van Bemmelen*, 155 T.C. at 78; *see* Rule 121(j). In a case such as this involving review of the WBO's adverse determination of a whistleblower's claim to an award, "summary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Van Bemmelen*, 155 T.C. at 79.

2.    *Analysis*

Section 7623(a) authorizes the payment of sums necessary for "detecting underpayments of tax" or "detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws or conniving at the same." Subsection (b)(1) provides for awards of at least 15% and not more than 30% of the collected proceeds if all stated requirements are met. Under section 7623(b)(1), an award can be paid only if the IRS "proceeds with an[] administrative or judicial action . . . based on information brought to the Secretary's attention." The whistleblower is entitled to an award only if the IRS collects money "as a result of the action." I.R.C. § 7623(b)(1).

The WBO's initial determination denied petitioner's award claim on the ground that petitioner's information "did not substantially contribute to the actions taken by the IRS." This Court previously remanded this case to the WBO for further investigation or explanation of three questions: (1) whether petitioner's information caused the target taxpayers' entry into the VDP, either directly or indirectly, (2) whether the existence of a whistleblower or the whistleblower's information was disclosed to the target taxpayers, and (3) whether petitioner's information was used in the examination of the target taxpayers' voluntary disclosure.

In response to these directives, the WBO concluded in its supplemental determination that (1) the whistleblower's information did not cause the target taxpayers' entry into the VDP, directly or indirectly; (2) the existence of a whistleblower, but not the whistleblower's information, was disclosed to the taxpayer and his representatives in 2012; and (3) although the whistleblower's information was reviewed and used during the examination of the target taxpayers' VDP filing, no examination adjustments, assessments, or

**[\*45]** proceeds resulted from the examiner's use of the whistleblower's information but rather all examination assessments and proceeds collected resulted from the VDP information, including taxpayer 1's delinquent and amended tax returns. STA Chatham's supplemental ARM, attached to the supplemental determination, explains in detail the basis for these conclusions.

Challenging these conclusions, petitioner argues that the target taxpayers' VDP request was untimely because the IRS received it after petitioner had already submitted Form 211 to the WBO. Petitioner also suggests that the VDP request might have been incomplete or untruthful, and consequently that it constituted an abuse of discretion for the WBO to deny petitioner's award claim on the basis of VDP documents that are absent from the administrative record. As STA Chatham indicated in his supplemental ARM, however, decisions made by IRS field personnel to accept the target taxpayers' VDP request were outside the WBO's purview and cannot be used as the basis of an award to petitioner. The issue before us in this whistleblower proceeding is not whether the IRS properly granted the target taxpayers' VDP request but rather whether the WBO abused its discretion in denying petitioner's award claim. Even if the VDP request was untimely or defective in some other manner, the administrative record shows that the IRS did in fact grant the VDP request and that the target taxpayers subsequently filed delinquent and amended tax returns and paid the tax liabilities reported therein. STA Chatham did not abuse his discretion in making his determinations in this regard.

Similarly, STA Chatham did not abuse his discretion in determining that petitioner's award claim did not directly or indirectly cause the target taxpayers to file their VDP request. The administrative record confirms this sequence of events: (1) in December 2010 petitioner submitted Form 211 to the WBO; (2) in January 2011 CI's Dallas, Texas, field office received the target taxpayers' VDP request; (3) in March 2011 the WBO forwarded petitioner's Form 211 (without supporting documents) to CI's Philadelphia Lead Development Center;[27] and (4) in June 2011 CI's Philadelphia Lead Development Center referred petitioner's award claim information to a CI analyst for consideration. As STA Chatham observed in his supplemental ARM, this sequence of events "provides virtually no chance" that the target taxpayers found out about petitioner's award claim before submitting their VDP

---

[27] The WBO did not forward the complete Form 211, including supporting documents, to CI until July 2011.

[*46] application to CI; "[t]he only way" petitioner's award claim could have caused the target taxpayers to file their VDP request would have been for them to learn about petitioner's claim from some source other than the IRS. STA Chatham further observed: "However, knowledge of any such incident is not available to the IRS, and there is no trace of information connected to this claim case that suggests that it did occur." These conclusions are logical, reasonable, and consistent with the administrative record.

As petitioner points out, the IRS did not receive the target taxpayers' first round of delinquent returns until March 2013, over two years after they submitted their VDP request. In the interim the WBO had referred petitioner's whistleblower information to SB/SE after CI had declined to examine the case. The administrative record indicates that RA Martin in SB/SE used petitioner's whistleblower information to issue IDRs and summonses but ultimately was unable to verify petitioner's information. STA Chatham did not abuse his discretion in concluding, on the basis of his communications with RA Martin and his review of the administrative record, that petitioner's whistleblower information could not be credited with any adjustments or collected proceeds, which instead were based on the target taxpayers' delinquent and amended returns. That conclusion is further buttressed by the lack of any discernible correlation between the types and amounts of unreported income as alleged in petitioner's Form 211 and as reported in the target taxpayers' delinquent and amended returns.

It is undisputed that the IRS made missteps in the summer of 2012 when it revealed to the target taxpayers' representative, in communications about the target taxpayers' eligibility for the VDP program, the existence (but not the identity) of a whistleblower. Petitioner asserts that this improper disclosure constituted an "administrative action" based upon petitioner's whistleblower information and that this disclosure induced the target taxpayers to subsequently file their delinquent and amended tax returns. Petitioner suggests that the target taxpayers' tax liabilities would not have been reported and paid but for the IRS's disclosure of the existence of a whistleblower.

Upon remand, STA Chatham further investigated the timing and circumstances of the improper disclosure of the existence of a whistleblower. He concluded that the improper disclosure "cannot be reasonably presumed to have motivated" the target taxpayers to file their delinquent tax returns for several reasons: the target taxpayers'

**[*47]** request to enter the VDP program was made in 2011, well before the improper disclosure occurred in 2012; the target taxpayers' entry into the VDP program obligated them to file delinquent returns and pay taxes due; that obligation was reinforced by the IRS's referral of the target taxpayers for civil audit in SB/SE in February 2012, before the improper disclosure occurred; and according to representations by the target taxpayers' representative, as described in RA Martin's Form 11369 and in his communications with STA Chatham on remand, the target taxpayers' entry into the VDP program was precipitated by a letter that taxpayer 2 had received (again, well before the improper disclosure) from the IRS regarding unfiled returns. STA Chatham's determinations in this regard are reasonable, logical, and fully supported by the administrative record. Any suggestion that the IRS would not have collected the taxes reported on the target taxpayers' delinquent and amended returns but for the disclosure of the existence of a whistleblower is entirely speculative and is insufficient as the basis for a mandatory award under section 7623(b)(1). *Cf. Lissack v. Commissioner*, 68 F.4th at 1322 (rejecting "but for" causation as the basis for a mandatory award under section 7623(b)(1) and the applicable regulations).

G.    *Conclusion*

We conclude and hold that the WBO did not act arbitrarily, capriciously, with abuse of discretion, or otherwise not in accordance with law in denying petitioner's claim for an award. Accordingly, we will grant respondent's Motion for Summary Judgment and deny petitioner's Cross-Motion for Summary Judgment.

*An appropriate order and decision will be entered.*